UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAVIER TOMAS MUNOZ
MATERANO,

                Petitioner,

        *– against –*

PAUL ARTETA, *in his official capacity as Warden of the Orange County Correctional Facility*; LADEON FRANCIS, *in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement*; TODD LYONS, *in his official capacity as Acting Director of Immigration and Customs Enforcement*; KRISTI NOEM *in her official capacity as Secretary of Homeland Security*; PAM BONDI, *in her official capacity as Attorney General*,

                Respondents.

**OPINION & ORDER**

25 Civ. 6137 (ER)

---

RAMOS, D.J.:

    Javier Tomas Munoz Materano ("Munoz Materano") brings this *habeas corpus* proceeding pursuant to 28 U.S.C. § 2241, challenging the lawfulness of his ongoing detention by Immigration and Customs Enforcement ("ICE"). Doc. 1. Munoz Materano, a 23-year-old asylum applicant and citizen from Venezuela, was detained by ICE as he was exiting a scheduled hearing in New York immigration court on May 21, 2025. *Id.* ¶¶ 8, 18, 20. In the instant petition, Munoz Materano argues that his detention violates the Due Process Clause of the Fifth Amendment, the Fourth Amendment, the Administrative Procedure Act ("APA"), and the Immigration and Nationality Act ("INA"). *Id.* at 29 ¶¶ 2, 4. Munoz Materano seeks immediate release from custody, declaratory relief, injunctive relief, and reasonable attorneys' fees. *Id.* at 29 ¶¶ 1–7.

    For the reasons set forth below, the petition is GRANTED.

## I.    BACKGROUND

### A.    Factual Background[1]

Munoz Materano fled Venezuela on July 19, 2023 after his family was targeted by
Tren de Aragua[2] who, in part, invaded their home and threatened to kill them at gunpoint.
Doc. 1-2 (Munoz Materano Decl.) ¶¶ 2, 3.  Munoz Materano entered the U.S. on August
28, 2023, in El Paso, Texas.  *Id.* ¶ 2; Doc. 8 ¶ 4.  He states that he entered in El Paso after
making an appointment through the U.S. Customs and Border Protection's ("CBP")
cellphone application called "CBP One," and "following the government's process for
this lawful pathway to be paroled into the United States."[3]  Doc. 1 ¶ 15.  Munoz
Materano does not speak or understand much, if any, English.[4]

Upon entry, Munoz Materano was arrested by a CBP Border Patrol Officer and
transported to a facility in El Paso for further processing.  Doc. 8 ¶ 4.  That day, on
August 28, CBP served Munoz Materano with a Notice to Appear ("NTA"), stating that

---

[1] The following facts are primarily drawn from Munoz Materano's *habeas* petition, Doc. 1, his sworn
declaration, Doc. 1-2, the declarations of Dr. Kate Sugarman and attorney Rosanna Eugenio in support
thereof, Docs. 1-3 and 16-1, Respondents' opposition, Doc. 7, Respondents' declaration in support thereof,
Doc. 8, and Munoz Materano's medical records, Docs. 9-1 and 9-2.  The facts recited here are undisputed
unless otherwise noted.

[2] Tren de Aragua is a criminal organization based in Venezuela which "the State Department has designated
as a foreign terrorist organization."  *Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (citing 90 Fed. Reg.
10030 (2025)); *see also id.* at 1008 (Sotomayor, J., dissenting) (explaining that, on March 14, 2025,
President Trump "invoked the Alien Enemies Act to address an alleged 'Invasion of the United States by
Tren De Aragua.'" (citation omitted)).

[3] "During the Biden Administration, DHS began directing noncitizens to use the CBP One mobile
application as the primary, if not exclusive, mechanism to seek parole and/or asylum at the southwestern
border.  The Trump Administration disabled that functionality in CBP One in January 2025[.]"  *Coalition
for Human Immigrant Rights v. Noem*, No. 25 Civ. 872 (JMC), 2025 WL 2192986, at *8 (D.D.C. Aug. 1,
2025) (citing, *inter alia*, Circumvention of Lawful Pathways, 88 Fed. Reg. 31314, 31317–18 (May 16,
2023)).

[4] Although Munoz Materano does not explain whether he understands or speaks any English, it is apparent
from the record that his English proficiency is limited.  His medical records state that he speaks Spanish
and requires a language interpreter.  *See* Doc. 9-1 at ECF 79.  As discussed below, Munoz Materano states
he could not understand what was said in English at his May 21 hearing, nor the English language
document that was provided to him at that time.  Moreover, one of his attorneys, Rosanna Eugenio, states in
her declaration that Munoz Materano had to rely on a fellow detainee to convey to her over the phone what
was stated on an English document he received while in detention.

he was put "[i]n removal proceedings under section 240 of the [INA]."[5]  Doc. 8-1 at 1.
The NTA required Munoz Materano to appear for a hearing before an immigration judge
on February 10, 2026, in Boston.  *Id.*  CBP also granted Munoz Materano humanitarian
parole pursuant to 8 U.S.C. § 1182(d)(5), releasing him from custody.  *Id.*; Doc. 1 ¶ 15;
Doc. 8 ¶ 7.

Approximately 16 months later, on January 21, 2025, Munoz Materano filed a
request for a change of venue from Boston to New York, which the immigration court in
Boston granted on February 12, 2025.  *See* Doc. 8 ¶¶ 8, 9.  Munoz Materano then moved
to New York and applied for asylum, withholding of removal, and protection under the
Convention Against Torture ("CAT").  Doc. 1 ¶¶ 15, 40.

On April 25, 2025, Munoz Materano was issued an Employment Authorization
Document ("EAD"), valid until August 26, 2025, which allowed him to obtain
employment in the U.S.  *See* Doc. 1-9.  Munoz Materano had stable employment at
Ramirez Seafood in Brooklyn, New York.  Doc. 1-2 ¶ 6.  He also completed a 40-hour
Occupational Safety and Health Administration course, obtained a certificate for an
electricity practical training course, *see* Doc. 1-9, and was taking classes to obtain a
driver's license.  Doc. 1-2 ¶ 6.  Munoz Materano was never arrested or incarcerated prior
to May 21, 2025.  *Id.* ¶ 28.

On May 21, 2025, Munoz Materano went to a scheduled asylum hearing at
immigration court, at 290 Broadway in New York City.  Doc. 1 ¶ 18.  Munoz Materano
did not have a lawyer representing him at the hearing.  *Id.*  After he was sworn in, the
Immigration Judge (IJ) paused his case because he had received a message, which Munoz

---

[5] Section 240 of the INA is codified at 8 U.S.C. § 1229a.  An individual placed in Section 240 removal
proceedings may raise an asylum claim as a defense to removal.  *See Shakova v. Cioppa*, No. 24 Civ. 07763
(LJL), 2025 WL 1531696, at *1 (S.D.N.Y. May 29, 2025) ("A noncitizen may seek asylum either
affirmatively before USCIS or defensively during removal proceedings in immigration court."); *see also
J.O.P. v. U.S. Department of Homeland Security*, 338 F.R.D. 33, 43 (D. Md. 2020) (explaining that the
defensive asylum process "begins when an individual is placed in section 240 removal proceedings in
immigration court and raises their asylum claim as a defense to removal.").

Materano states "may have come from DHS." *Id.* ¶ 19.  The IJ asked him to step to the back while he reviewed the information and kept going with other cases.  Doc. 1-2 ¶ 9. When the IJ returned to Munoz Materano's case, he asked Munoz Materano if he wanted to continue with his case, and Munoz Materano said yes.  *Id.* ¶ 10.  Then, the IJ had a discussion with the DHS attorney in English; Munoz Materano states that he does not know what they discussed because he was not provided with a Spanish interpreter.  *Id.* Respondents provide that ICE moved to dismiss Munoz Materano's Section 240 proceeding, and the IJ granted the motion.  Doc. 7 at 1, 3; Doc. 8 ¶ 10.  In the instant petition, Munoz Materano states that he did not understand or consent to the dismissal. Doc. 1 at 1.

Munoz Materano states that, following the IJ's discussion with the DHS attorney, he was handed a paper written in English that he did not understand.  Doc. 1-2 ¶ 10.  As he left the immigration hearing, he attempted to use his phone to translate the piece of paper with a translation application.  *Id.*; Doc. 1 ¶ 20.  As Munoz Materano reached for his phone, four people in plain clothes, and with no identification or badges, rushed toward him.  Doc. 1 ¶ 20.  The four individuals tightly handcuffed him, pulled him into an elevator, then took him to a van outside.  Doc. 1-2 ¶¶ 10, 11.  Munoz Materano states that, in that moment, he felt like he was being kidnapped and was traumatized.  *Id.* ¶ 10.

Munoz Materano remained in the van, tightly handcuffed, for approximately three hours, during which he was not provided any explanation about who had taken him or why.  *Id.* ¶ 11.  Then, he was taken into 26 Federal Plaza in downtown Manhattan, where he remained in handcuffs for another hour.  *Id.*  When his handcuffs were removed, Munoz Materano spoke with an officer who stated—erroneously, according to Munoz Materano's counsel—that he had been ordered deported.  Doc. 1 ¶ 22.  Munoz Materano

expressed his fear of returning to Venezuela and requested a credible fear interview.[6]  *Id.*
Thereafter, Munoz Materano states he was placed in a cell with about fifteen other
detainees, where he slept on the floor.  *Id.* ¶ 23.

Early the next morning, Munoz Materano states he was handcuffed by his hands
and feet and taken to a detention facility in Newark, New Jersey, where he was placed
into a crowded and smelly room where there "was no room to sleep."  Doc. 1-2 ¶ 14;
Doc. 1 ¶ 24.  Later that morning, he states he was flown to the Port Isabel Detention
Center[7] in Texas, where he remained for six hours before being transferred to a detention
center in El Paso, Texas.  Doc. 1-2 ¶ 14.  Respondents state that he was transferred to the
facility in El Paso on May 23.  Doc. 8 ¶ 12.  Munoz Materano was still wearing the same
clothes and underwear he had been arrested in on May 21.  Doc. 1-2 ¶ 15.  He remained
in the El Paso facility for fifteen or sixteen days where, Munoz Materano states, he
received no information or update on his case.  *Id.*

Munoz Materano was not allowed to shower or to change his underwear and
socks for approximately three days after he arrived in El Paso.  Doc. 1 ¶ 27.  Throughout
his detention there, he was only allowed to shower every two to four days and was not
given a change of underwear for even longer periods.  *Id.* ¶ 27; Doc. 1-2 ¶ 15.  About a
week into his detention in El Paso, he noticed pain ███████, and about a week later,
also noticed itchiness and white spots on his legs ██████.  Doc. 1 ¶ 28; Doc. 1-2 ¶
15.  Munoz Materano had never suffered from these conditions prior to his detention.

---

[6] A "credible fear interview" can occur as part of the expedited removal process pursuant to 8 U.S.C. §
1225.  Through the expedited removal process, unlike in Section 240 proceedings, DHS can order the
removal of a noncitizen "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i); *cf.* 8 U.S.C. §
1229a(4)(B) (for Section 240 proceedings, providing that noncitizens' rights include "a reasonable
opportunity to examine the evidence against the alien, to present evidence on the [noncitizen's] own behalf,
and to cross-examine witnesses presented by the Government.").  However, the expedited removal statute
provides for the credible fear interview as a limited additional screening; if a noncitizen in the expedited
removal process passes their credible fear interview, they are then permitted to apply for asylum through
Section 240 proceedings.  *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30(f).

[7] The Court presumes that this is the Port Isabel *Processing* Center, in Los Fresnos, Texas, as it is referred to
in Respondents' papers.  *See* Doc. 8 ¶¶ 23, 25.

Doc. 1 ¶ 28. Munoz Materano's medical records reflect that on June 2, 2025, in El Paso, he had a medical appointment with a nurse practitioner. Doc. 9-2 at ECF 77. The notes state that Munoz Materano reported a headache,[8] sore throat, and pain in ████████████ which he referred to as "hernia pain." *Id.* The records identify that the severity of the pain was rated at a 7/10, described as "moderate," and characterized as "aching." *Id.* They also state that the onset of Munoz's ██████ pain was gradual. *Id.*

From El Paso, Munoz Materano was transferred to the Alexandria Staging Facility ("Alexandria") in Alexandria, Louisiana, where he stayed from approximately June 7 to June 14, 2025. Doc. 1 ¶ 29. Munoz Materano was not provided with a uniform or other clean clothes there, so he continued wearing the jeans he had been arrested in on May 21. *Id.* During this time, Munoz Materano was experiencing pain and swollen masses ████ ████, and he was still noticing the white spots and itchiness on his legs ████████. *Id.* He also began experiencing pain during urination. *Id.* He requested medical attention on at least three separate occasions while at Alexandria, and while a nurse provided him with medicine for pain relief, he states he was not examined, diagnosed, or provided treatment. *Id.*[9]

On June 13, 2025, Munoz Materano was transferred from Alexandria to the Port Isabel Service Processing Center ("Port Isabel") in Los Fresnos, Texas. Doc. 1 ¶ 30; Doc. 8 ¶ 23. There, he was able to change out of the clothes he was arrested in and provided with a clean detention uniform for the first time. Doc. 1 ¶ 30. The next day, June 14, Munoz Materano was also provided with a medical screening for the first time since he had been detained. *Id.*; *see* Doc. 9-2 at ECF 64. The notes from that screening do not mention any pain or other symptoms. *Id.* However, medical records from an

---

[8] Munoz Materano's medical records state that, according to him, he has a history of chronic, severe headaches, which have previously led to hospitalization. *See, e.g.*, Doc. 9-2 at ECF 23.

[9] While his medical records contain a "transfer summary" dated June 12, 2025, at Alexandria, Doc. 9-2 at ECF 66–67, it does not appear from the face of those notes whether Munoz Materano received any medical examination or attention.

appointment that took place two days later, on June 16, state that Munoz Materano requested the appointment due to discomfort while urinating, and that he had been experiencing discomfort for three days. Doc. 9-2 at ECF 57. However, according to the notes, Munoz Materano denied having a burning sensation at that time. *Id.* In the "assessment" section, the nurse identified a "risk for infection," and she accordingly prescribed Acetaminophen. *Id.* at ECF 58.

There are also medical records from Port Isabel from June 17, which state that Munoz Materano requested an appointment due to skin conditions and itchiness. *Id.* at ECF 54. Those notes state that Munoz Materano reported no current pain, however he stated he had "a fungal infection located on ███████████," with "red and white dry patches" and a lot of itchiness. *Id.* The notes indicate that the nurse discussed with the "sick call provider" that Terbinafine 1% or Clotrimazole 1% should be provided to Munoz Materano. *Id.* at ECF 55.

Medical records from Port Isabel from the following day, June 18, provide that Munoz Materano requested an appointment due to ██████ pain. *Id.* at ECF 50. The notes reflect that he rated his pain at a 7/10, described it as "mild," and characterized it as "aching." *Id.* The narrative section states that Munoz Materano complained of "discomfort and pain to ███████████," that he thought he "might have a hernia" there, and that he was having a "mild burning sensation upon urinating." *Id.* at ECF 50. In the "assessment" section, the nurse identified a "risk for infection," and he accordingly prescribed Ibuprofen. *Id.* at ECF 51.

Medical records from Port Isabel from June 19 provide that Munoz Materano requested the appointment due to ██████ pain and dysuria. *Id.* at ECF 43. They reflect that he again rated his ██████ pain at a 7/10, described it as "mild," and characterized it as "aching," and that he reported a burning sensation when urinating. *Id.* The notes indicate that Munoz Materano reported that his discomfort had recently increased, he had developed swelling ██████████ and noticed a mass on it, and that

he also had a rash in the "███████." *Id.* The physician assistant ("PA") provided a general examination of Munoz Materano, and he noted that his "████████████," and that his ████████████ and had a "████ mass." *Id.* at ECF 44. He recommended Clotramizole Cream 1% for Munoz Materano's skin infection, and for the ████████, he prescribed Ibuprofen. *Id.* The PA also wrote a referral to radiology for "U/S[10] ████." *Id.* at ECF 108. However, the radiology referral was subsequently cancelled because Munoz Materano was transferred out of Port Isabel. *Id.* Munoz Materano states that he has never received imaging for the ████ mass or any other tests.[11] Doc. 1 ¶ 30.

On June 22, 2025, Munoz Materano was transported from Port Isabel to the Pine Prairie ICE Facility ("Pine Prairie") in Pine Prairie, Louisiana. Doc. 8 ¶ 24. The morning of the transfer,[12] he was awakened at approximately 1 a.m., made to change out of his uniform and back into the jeans he had worn on the day of his arrest on May 21, handcuffed, and put on a plane. Doc. 1 ¶ 31; Doc. 1-2 ¶ 18. Munoz Materano states that, after more than a month of not being washed, his jeans smelled horrible, and he could feel how dirty they were. Doc. 1-2 ¶ 18. Munoz Materano's medication was taken from him, and he was not given any food for about twelve hours. Doc. 1 ¶ 31. He asked officers on the plane for medical attention multiple times because he was experiencing pain in his ████ and a headache, but the officers refused. *Id.* Munoz Materano

---

[10] The Court presumes that "U/S" is an abbreviation for "ultrasound." Doc. 9-2 at ECF 108. Medical records from July 12 note that Munoz Materano stated he was awaiting an ultrasound. *See id.* at ECF 17.

[11] Respondents have provided Munoz Materano's medical records and state: "[Munoz Materano] has been seen no fewer than 23 times since he was detained, has had a urinalysis completed, has had numerous chest X-rays performed, has been diagnosed with epididymitis, and has received medications to treat his medical conditions[.]" Doc. 7 at 21 (citing to Docs. 9-1, 9-2). Munoz Materano responds, "while Respondents cite numerous x-rays, these were chest scans for tuberculosis and have no relevance to the swollen masses." Doc. 16 at 13.

[12] Petitioner states—seemingly in error—that the transfer to Pine Prairie began "on or about Saturday, June 14, 2025." Doc. 1 ¶ 31. The Court presumes that June 22, 2025, the date listed in the affidavit of ICE Deportation Officer Michael Charles, Doc. 8 ¶ 24, is the correct date on which Munoz Materano was transported to Pine Prairie.

remained handcuffed and in dirty clothes on the plane all day as it landed in multiple locations, until it eventually arrived in Louisiana at approximately 7 p.m.  *Id.*

Once off the plane, Munoz Materano was taken by bus with other detainees to Pine Prairie.  *Id.* ¶ 32.  He states that, traveling in extreme heat for over two hours, with no air conditioning, and with no windows open, he nearly fainted from his headache, lack of food, and pain ███████████.  *Id.*; Doc. 1-2 ¶¶ 20, 21.  In Pine Prairie, Munoz Materano was placed in a crowded cell with urine stains on the walls, where he slept on the floor with over 100 other men.  Doc. 1 ¶ 32.  He states that the detainees begged the officers for cleaning products to clean and mop.  Doc. 1-2 ¶ 24.  Further, Munoz Materano states, "[t]he area outside where the plates of food [were] assembled is right next to the garbage so there were cockroaches, mosquitos, worms everywhere."  *Id.*

At Pine Prairie, Munoz Materano continued to tell officers about his symptoms including pain ████████ and white spots on his skin, which were getting bigger and had spread from his legs ████████ to his face.  Doc. 1 ¶ 33.  Munoz Materano states that, within a few days, his face became extremely red and swollen, and he had a fever, chills, and was experiencing intense pain.  *Id.*  He states in his declaration: "[I]t was the sickest I had felt while detained.  I could barely walk because the pain was so strong.  I thought I was going to die there."  Doc. 1-2 ¶ 22.  Munoz Materano states that, despite his visible symptoms and his repeated requests for medical care, he did not receive any medical attention for three days, after which he was ultimately allowed to see a doctor.  Doc. 1 ¶ 33.  Medical records from June 24 reflect that, at Pine Prairie, Munoz Materano was seen by a PA, who noted: "22 y/o male referred for ████████ pain and itching x 6 weeks.  Treated in last facility with ibuprofen and clotrimazole cream with mild improvement.  No injury.  No discharge or fever.  Pain does not radiate, no alleviating factors, worse with touching area."  Doc. 9-1 at ECF 76.  Munoz Materano provides that the PA did not conduct a physical examination or touch the area, notwithstanding that he described his pain, the cysts, and the visible swelling.  Doc. 1 ¶ 33; Doc. 1-2 ¶ 23.  This

PA prescribed Clotrimazole 1% for the skin infection, as well as Doxycycline and Ibuprofen. Doc. 9-1 at ECF 77.

On June 26, Munoz Materano was transported back to Port Isabel. Doc. 8 ¶ 25. For the transfer, he was made to change back into the same dirty clothes he was wearing when he was arrested. Doc. 1 ¶ 34. At Port Isabel, he informed officers of his symptoms and asked for medical attention but did not receive it. *Id.* In Port Isabel, however, Munoz Materano's dirty jeans were washed for the first time. *Id.*

On June 28, Munoz Materano was transferred to the Coastal Bend Detention Center ("Coastal Bend") in Robstown, Texas. *Id.* ¶ 35; Doc. 8 ¶ 26. There, Munoz Materano states that he was not allowed to use the cream he had been prescribed for his skin infection. Doc. 1 ¶ 35. He was, however, provided with painkillers and antibiotics to treat a pain in his throat that had developed in Pine Prairie. *Id.* On July 8, he received a medical assessment; the PA identified epididymitis, dysuria, ███ pain, and hypopigmentation; and noted: "███ were very tender throughout bilaterally. No palpable masses." Doc. 9-1 at ECF 100–101. Under "Assessment," the PA noted, in part: "███—suspect still epididymitis. He did not take his Doxy here regularly and never completed a full course. For epididymitis it should be a 10 day course." *Id.* at ECF 101. Under "Plan," she wrote: "I suspect he did not get complete tx of his infection. Given 10 days of Doxy. He feels a nodule and so I also want to get ███ U/S[13] to evaluate further . . . For his ███ will get ███ lab. Ordered hepatitis panel, ███. [Follow up] per results or if not better." *Id.*

On July 11, Munoz Materano was transported back to Alexandria. Doc. 8 ¶ 27. That day, he had a medical intake, at which he reported that his urine had been dark yellow, and that he was experiencing a burning sensation as well as ███. *See*

---

[13] The Court again interprets "U/S" as "ultrasound." *See supra*, n.10.

Doc. 9-2 at ECF 20.  Munoz Materano's medical records also contain a "transfer summary" from July 12, at Alexandria.  *See* Doc. 9-2 at ECF 18.  The summary lists the following under "Past Medical History":  "Chronic 'Severe' Headaches (per patient). ███████████  PAIN/INFECTION.  FUNGAL SKIN INFECTION. ███████ mass."  *Id.*  Under "Past Orders," the records list that a chest X-ray was ordered and performed on June 27.  *Id.*  Moreover, the summary states that Munoz Materano rated his ██████  pain at an 8/10, and that he was awaiting an ultrasound for the ████ mass.  *Id.* at ECF 17.

On July 13 or 14, Munoz Materano was transferred to the Orange County Jail ("Orange County") in Goshen, NY.  Doc. 1 ¶ 36; Doc. 8 ¶ 28.  This transfer is the last transfer mentioned on the record, indicating that from May 21 through July 25, 2025, the date the instant petition was filed, Munoz Materano was transferred at least ten times, to at least eight detention centers in four different states.  No reason is provided for the frequent transfers.

Munoz Materano received a medical intake upon his arrival at Orange County, in which he informed a nurse of his skin infection and painful, swollen masses ████ ████.  Doc. 1 ¶ 36.  However, he states that the nurse did not examine the area or perform any kind of physical exam.  *Id.*  Munoz Materano states that, as of the date of his *habeas* petition, he had requested medical attention every day since his arrival in Orange County but had not received any medical attention since the initial intake.  *Id.* ¶ 37.  He describes intense, throbbing pain ██████████.  Doc. 1-2 ¶ 28.  Munoz Materano adds that he has trouble urinating and his urine is very yellow, and that his pain feels "almost like [he has] been beaten or kicked in that area," and it causes him to feel briefly disoriented.  *Id.*  Munoz Materano states that he has a loving fiancée, with whom he hopes to have a family someday, however he is "now afraid of being sterile for the rest of [his] life."  *Id.*

Munoz Materano's medical records show that, on July 14, a nurse at Orange County prescribed him Clotrimazole 1% to be administered twice daily for 13 days, Doxycyline to be administered twice daily for five days, and Ibuprofen to be administered twice daily for nine days. Doc. 9-1 at ECF 8, 10, 11. However, between July 14 and 26, Clotrimazole 1% was administered to him only seven total times. *Id.* at ECF 8–9. From July 14 to 18, his Doxycycline was administered seven total times. *Id.* at 10. And from July 14 to 22, his Ibuprofen was administered eleven total times. *Id.* at 11–12. Munoz Materano's counsel states that, several times throughout his detention, they have reached out to ICE to inform them of Munoz Materano's worsening condition and to urge them to provide him with adequate medical care. Doc. 1 ¶ 39 (citing email correspondence from June 25, June 27–29, and July 9, 2025, attached as exhibits E, F, G, respectively). Counsel states that, "[d]espite these frequent requests and [Munoz Materano's] rapidly deteriorating health, ICE has failed to perform testing to properly diagnose [him], has taken his medications away during transfers, and has ignored his pleas for medical attention." *Id.*

In her declaration submitted on August 13, 2025 in support of Munoz Materano's petition, Rosanna Eugenio, the Legal Director of the New York Immigration Coalition, provides additional accounts of Munoz Materano's physical condition. She states, in part:

> Beginning on or about July 27th, [Munoz Materano] reported to me that he was experiencing serious and worsening symptoms. He called multiple times during the evening and the following morning and stated that he was experiencing numbness in his legs and an inability to walk or stand from excruciating pain ▮▮▮▮▮▮▮▮. He was finally given medical care on July 28th and was taken to medical in a wheelchair, assisted by fellow detainees, because he was unable to walk on his own.
>
> [ . . . ]
>
> [Munoz Materano] continues to feel pain ▮▮▮▮▮▮▮▮ daily as well as other symptoms like pain in or around his kidneys, stomach pain and cramping from his multiple medications, and numbness and cold sensation in his legs. He is unable to sleep because his pain is a consistent 8 out of

10.  After his most recent severe medical episode, [Munoz Materano] told me that he thought he was going die there; the second time he has expressed that his medical distress reached this unbearable level.

Doc. 16-1 ¶¶ 12–13.

### B.  Procedural History

#### 1.  *Immigration Proceedings*

As previously discussed, Munoz Materano entered the U.S. on August 28, 2023, and at that time, DHS placed him in removal proceedings under 8 U.S.C. § 1229a[14]—that is, Section 240 removal proceedings—and released him on parole.  Doc. 7 at 1; Doc. 8 ¶¶ 4–7.  On the day of Munoz Materano's hearing in New York immigration court on May 21, 2025, his case was progressing through Section 240 removal proceedings, with his application for asylum, withholding of removal, and CAT pending.  Doc. 1 ¶ 40.  During the hearing, ICE moved to dismiss his Section 240 proceedings, and the IJ granted the motion.  Doc. 7 at 1, 3.  ICE then immediately detained Munoz Materano and initiated expedited removal proceedings pursuant to INA § 235(b), 8 U.S.C. § 1225(b).[15]  Doc. 8 ¶ 10.

On May 23, 2025, Munoz Materano filed a motion to reopen and for an emergency stay of removal, in New York immigration court.  *See* Doc. 8 ¶ 13.  DHS filed an opposition on May 27.  *Id.* ¶ 14.  On June 4, Munoz Materano "renewed the motion,"

---

[14] § 1229a provides that "[a]n immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien"; that "[a]n alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under [§] 1182(a) . . . or any applicable ground of deportability under [§] 1227(a) . . ."; and "[u]nless otherwise specified in this chapter, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States."  8 U.S.C. § 1229a(1)–(3).

[15] 8 U.S.C. § 1225(b) applies to the inspection of (1) "aliens arriving in the United States and certain other aliens who have not been admitted or paroled" and (2) "other aliens."  §§ 1225(b)(1), (2).  Section 1225(b)(1) provides:  "If an immigration officer determines that an alien . . . who is arriving in the United States . . . is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution."  § 1225(b)(1)(A)(i).  Title 8 U.S.C. § 1225(b)(2) provides:  " . . . in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title."  § 1225(b)(2)(A).

and DHS filed an opposition that same day. Doc. 7 at 3. On June 6, 2025, the IJ denied the motion to reopen. Doc. 8 ¶ 17. On June 10, Munoz Materano filed a third motion to reopen and for an emergency stay of removal, which DHS opposed on June 11. *Id.* ¶¶ 19, 20. The next day, on June 12, 2025, Munoz Materano timely filed an appeal with the Board of Immigration Appeals ("BIA"), challenging the IJ's dismissal of his Section 240 removal proceedings. *Id.* ¶¶ 21, 22. The BIA granted the stay of removal, however the appeal of the IJ's decision granting ICE's motion to dismiss the Section 240 removal proceedings remains pending. *Id.* ¶¶ 22, 29.

It is undisputed that Munoz Materano remains in Section 240 removal proceedings while his appeal is pending with the BIA. Doc. 1 ¶ 98; Doc. 7 at 7. Respondents state that, although Munoz Materano is currently subject to § 1229a proceedings, if the dismissal of those proceedings is affirmed by the BIA, "then the expedited removal provisions of § 1225(b)(1) would apply." Doc. 7 at 5 n.1.

    *2. The Instant Case*

On July 25, 2025, Munoz Materano filed the instant petition for *habeas corpus*, seeking his immediate release from custody, declaratory relief, injunctive relief, and reasonable attorneys' fees. Doc. 1. Munoz Materano attached various exhibits, including his own declaration and a declaration by Dr. Kate Sugarman. Docs. 1-2, 1-3. Dr. Sugarman states in part that, based on her review of an excerpt of his medical records,[16] Munoz Materano "suffers from chronic headaches, ███ pain, fungal skin infection, and a ███ mass," and that his symptoms "could be an indication of ███ torsion, infection, or ███ cancer," which require immediate attention. Doc. 1-3 at ECF 3; *id.* ¶ 5. She expresses concern that Munoz Materano has not been "referred to a urologist or oncologist, nor received diagnostic imaging or a biopsy," and opines that his

---

[16] Dr. Sugarman states that, in preparing her declaration, she reviewed intake screening and medical records dated 7/14/2025–7/21/2025, Munoz Materano's ICE Transfer Summary from Alexandria Staging Facility dated 7/12/2025, and a personal declaration by Munoz Materano describing his health conditions. *Id.* ¶ 4.

"[c]urrent medical records do not indicate appropriate referrals, imaging, testing or follow-up care." *Id.* ¶¶ 7, 10.  Dr. Sugarman also explains that if ███ torsion goes untreated, it can lead to permanent loss of the ███, and if ███ cancer is not diagnosed early, it could require intensive treatment such as chemotherapy or radiation and could lead to infertility, metastatic cancer, or even death.  *Id.* ¶¶ 6, 8, 9.  Therefore, Dr. Sugarman concludes that, "[w]ithout timely evaluation," Munoz Materano's condition "could lead to infertility, permanent injury, or death if cancer is present."  *Id.* ¶ 10.

On August 8, 2025, Respondents filed an opposition to Munoz Materano's petition, and on August 13, 2025, Munoz Materano filed his reply.  Docs. 7, 16.  In support of his reply, on August 13, Munoz Materano submitted a declaration by his lawyer, Rosanna Eugenio, in which Ms. Eugenio describes certain conversations she has had with Munoz Materano, as well as with his fiancée, throughout his detention.  Doc. 16-1.  Ms. Eugenio states in part that, on August 11, she learned during a telephone call with Munoz Materano, with the assistance of an English-speaking detainee, that he received a notice stating that the parole he was granted on August 28, 2023, and that was to extend through August 28, 2025, was revoked.  *Id.* ¶ 15.  Ms. Eugenio adds that she has not received a copy of the notice.  *Id.*

Munoz Materano filed two notices of supplemental authority, on August 19 and 20, 2025, respectively.  Docs. 17, 17-1 and 18, 18-1, respectively.

## II.    DISCUSSION

Munoz Materano argues that his detention is not authorized, that his arrest violated the Fourth and Fifth Amendments as well as the INA and APA, and that the conditions of his confinement violate the Fifth Amendment, INA, and APA.

### A.  The Court's Jurisdiction

As a threshold matter, this Court has jurisdiction to hear Munoz Materano's *habeas* petition pursuant to 28 U.S.C. § 2241, which "authoriz[es] any person to claim in federal court that he or she is being held 'in custody in violation of the Constitution or

laws . . . of the United States.'" *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (quoting 28 U.S.C. § 2241(c)(3)).  While Respondents do not contest that the Court has jurisdiction to review Munoz Materano's challenges to his detention, they argue that it does not have jurisdiction over his challenges concerning expedited removal; Respondents also argue that this Court's jurisdiction is precluded by various jurisdictional bars imposed by the INA:  8 U.S.C. §§ 1252(a)(2)(A), 1252(g), and 1252(e)(3)(A).  Each of these jurisdictional challenges fails.

 1.  *Jurisdiction to hear claims regarding removal and expedited removal.*

 Respondents argue that Munoz Materano cannot challenge "matters relating to removal proceedings and expedited removal," first, because *habeas* petitions are only appropriate for challenging detention itself, and second, because "§ 1252(a)(2)(A) deprives [the] court[s] of jurisdiction to hear challenges relating to the Attorney General's decision to invoke expedited removal, [her] choice of whom to remove in this manner, [her] procedures and policies, and the implementation or operation of a removal order." Doc. 7 at 5–6 (quoting *Shunaula v. Holder*, 732 F.3d 143, 146 (2d Cir. 2013) (quotations omitted)).  Munoz Materano responds that he does not challenge the *fact* that Respondents decided to subject him to expedited removal proceedings, but rather the "procedural irregularities" with which Respondents exercised their discretion.  Doc. 16 at 2.

 Federal courts can review "'how' [the respondents] exercise their discretion because such a claim does not ask 'why the Secretary chose to execute the removal order' but rather 'whether the way [the respondents] acted accords with the Constitution and the laws of this country.'" *Torres-Jurado v. Biden*, No. 19 Civ. 3595 (AT), 2023 WL 7130898, at *2 (S.D.N.Y. Oct. 29, 2023) (citation omitted) (granting petitioner's motion for a stay of removal).  The Second Circuit has clearly stated that while § 1252 "strips jurisdiction over a substantive discretionary decision, [it] does not strip jurisdiction over procedural challenges." *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015) (finding

that the court had jurisdiction to review petitioner's claim that respondent "erred procedurally" in revoking an employment visa petition on grounds that it "violated its own regulations by providing insufficient notice of the revocation"). Therefore, because Munoz Materano challenges the "*procedure* surrounding the substantive decision" to invoke expedited removal against him, this Court clearly has jurisdiction over his claims. *Id.* (emphasis in original).

Moreover, Courts have reviewed these kinds of challenges when raised in *habeas* petitions. *See, e.g.*, *Orellana v. Francis*, No. 25 Civ. 04212 (OEM), 2025 WL 2402780 (E.D.N.Y. Aug. 19, 2025) (evaluating petitioner's claim that the revocation of his parole violated the APA, asserted as part of petitioner's *habeas* petition, and finding an APA violation because the respondents did not meet the statutory and regulatory standards for revocation); *Mata Velasquez v. Kurzdorfer*, No. 25 Civ. 493 (LJV), 2025 WL 1953796, at *6 (W.D.N.Y. July 16, 2025) ("[Petitioner] argues that ICE violated the statutory framework as well as constitutional law when it re-detained him. That is a question that falls squarely within this Court's *habeas* jurisdiction."). Respondents provide that the writ of *habeas corpus* is, at its core, a means for reviewing and remedying unlawful detention, yet they fail to show how that principle precludes judicial review over the claims at issue.

2. *Jurisdiction to review challenges to the Attorney General's "decision or action" to "commence proceedings" and to adjudicate cases."*

Respondents argue that Munoz Materano's "challenges are barred to the extent he challenges decisions and actions to commence proceedings and to adjudicate cases," Doc. 7 at 6, because 8 U.S.C. § 1252(g) bars courts from hearing claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien[.]" 8 U.S.C. § 1252(g). In response, Munoz Materano reiterates that he "is not asking the Court to review the exercise of Respondents' discretion in connection with any of the enumerated acts in Section

1252(g)," but rather whether Respondents acted lawfully in the manner that they exercised their discretion.  Doc. 16 at 3.

This jurisdictional challenge fails for the same reason as the first.  Section 1252(g) does not bar the Court from exercising jurisdiction over Munoz Materano's claim that "Respondents violated his constitutional due process rights and the INA when [they] moved to dismiss his Section 240 removal proceedings and re-detained him without prior notice or process," Doc. 16 at 3–4, because Munoz Materano does not seek to challenge the Attorney General's substantive use of discretion.  *See You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 457 (S.D.N.Y. 2018) ("[H]ere, the *habeas* petition does not challenge the discrete decision to remove Petitioner.  The question before the Court is not why the Secretary chose to execute the removal order.  Rather, the question is whether the way Respondents acted accords with the Constitution and the laws of this country.  Whether Respondents' actions were legal is not a question of discretion, and, therefore, falls outside the ambit of § 1252(g)."); *see also Torres-Jurado*, 2023 WL 7130898, at *3 (holding that plaintiff's claims that ICE violated his due process rights in revoking a stay without providing notice or an opportunity to be heard was not barred by § 1252(g) because it was not a challenge on "ICE's discretion to execute the removal order," but rather on "ICE's legal authority to revoke the ICE Stay without process.").

### 3. *Jurisdiction to evaluate challenges to a policy, statute, or regulation concerning expedited removal under the APA or the INA.*

Finally, Respondents argue that, pursuant to 8 U.S.C. § 1252(e)(3)(A), any challenges to "a policy, statute, or regulation concerning expedited removal under the APA or the INA," must be filed in the U.S. District Court for the District of Columbia, and are therefore barred in this District.  Doc. 7 at 6–7.  Munoz Materano responds that § 1252(e)(3) is inapplicable because it concerns challenges to the validity of a "system," and he "does not raise any systemic challenges."  Doc. 16 at 4.

Section 1252(e)(3), entitled "Challenges on validity of the system," provides in subsection (A) that "judicial review of determinations under [§] 1225(b) . . . is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of— (i) whether such section, or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is . . . in violation of law." 8 U.S.C. § 1252(e)(3).  Here, Munoz Materano does not challenge the lawfulness of any particular statute, regulation, or written policy or procedure.  Therefore, § 1252(e)(3)(A) does not strip this Court of jurisdiction over his claims.  *See Mata Velasquez*, 2025 WL 1953796, at *7 (holding in part that § 1252(e)(3) did not bar the court's review where the crux of petitioner's argument was that the government did not have the lawful authority to initiate the expedited removal process against him at that time; he did not challenge "the statutory framework").[17]

---

[17] Even if the INA's jurisdictional bars applied in this case, this Court would arguably still have jurisdiction pursuant to the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I § 9, cl. 2.  Courts consider "at least" the following three factors in determining whether the Suspension Clause applies:  "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the [detainee's] entitlement to the writ."  *Boumediene v. Bush*, 553 U.S. 723, 766 (2008); *see also Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020).  Here, all three factors weigh in Munoz Materano's favor.  As to the first factor, Munoz Materano is a parolee who has been living and lawfully working in the U.S., with no criminal history, for nearly two years.  *See Y-Z-L-H v. Bostock*, No. 25 Civ. 965 (MHS), 2025 WL 1898025, at *10 (D. Or. July 9, 2025) (holding that the petitioner, while a noncitizen, had "a much stronger status than the petitioners in *Boumediene* and *Thuraissigiam*" because he "was not apprehended only 25 yards from the border and immediately ordered removed, but was paroled into the United States and has remained here for nearly two years" during which time he "received two separate work authorizations and has developed significant ties to the community").  Moreover, Munoz Materano was re-detained with procedures that "[fell] well short of the procedures and adversarial mechanisms that would eliminate the need for *habeas corpus* review."  *Boumediene*, 553 U.S. at 767.  As to the second factor, he was detained within the sovereign territory of the U.S., which weighs in favor of finding that the Suspension Clause applies.  *Cf. id.* at 768.  Third, the record does not indicate any "practical obstacles"; to the contrary, it reflects that Munoz Materano is not a flight risk, having never been arrested in the U.S., worked here lawfully for almost two years, and voluntarily presented himself at his court hearing.  *See Y-Z-L-H*, 2025 WL 1898025, at *10 (holding that the Suspension Clause conferred jurisdiction to review a petitioner's *habeas* petition, in part because he was not a flight risk and was law-abiding).  Finally, because Munoz

### B. Munoz Materano's Arrest

*1. Section 1225 is not a legal basis for Munoz Materano's detention.*

Respondents state that, on May 21, 2025, they initiated the expedited removal process and detained Munoz Materano, pursuant to § 1225(b)(1). Doc. 7 at 2, 3. Subsequently, on June 12, 2025, Munoz Materano timely filed an appeal with the BIA, challenging the IJ's dismissal of his Section 240 removal proceedings. Doc. 8 ¶¶ 21, 22. Respondents therefore expressly concede that, while Munoz Materano's appeal is pending, he remains in Section 240 removal proceedings subject to § 1229a, not expedited removal pursuant to § 1225(b)(1). Doc. 7 at 7; Doc. 8 ¶ 29. They express their intention to continue pursuing expedited removal proceedings "*[s]hould* the BIA affirm" the IJ's dismissal of the Section 240 proceedings. Doc. 7 at 1 (emphasis added). There is no dispute, however, that Munoz Materano "is currently subject to" § 1229. *Id.* at 5 n.1. Therefore, Respondents' contention—made in response to Munoz Materano's Due Process challenges—that his "detention under 8 U.S.C. § 1225(b)(2)(A) for the duration of his removal proceedings is mandatory, subject only to the possibility of release on discretionary parole by ICE under 8 U.S.C. § 1182(d)(5)(A)," is inapposite. Doc. 7 at 14. Section § 1225(b) is not currently applicable to Munoz Materano. *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("*Habeas* review is not limited to evaluating the lawfulness of detention when it is first imposed . . . but is also available to challenge whether, at some point, an ongoing detention has become unlawful.").

Furthermore, the Court finds that § 1225(b) could not apply to Munoz Materano even absent the pending BIA appeal. This Court joins *Coalition for Human Immigrant Rights v. Noem*, No. 25 Civ. 872 (JMC), 2025 WL 2192986, at *30 (D.D.C. Aug. 1, 2025), in holding that § 1225 does not authorize expedited removal of individuals who have ever been paroled into the U.S. under either of its provisions: § 1225(b)(1)(A)(i),

---

Materano's pending BIA appeal only concerns his removal proceedings, if this Court were to be deprived of jurisdiction, he "would have no forum to challenge his detention." *Id.*

which applies to individuals "arriving in" the U.S., or § 1225(b)(1)(A)(iii)(II), which applies to individuals who "ha[ve] not been admitted or paroled" into the U.S. and cannot show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility."[18]  *See Coalition for Human Immigrant Rights*, 2025 WL 2192986, at *30 (explaining that "the only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither [provision of Section 1225(b)(1)].  Any other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words."); *see also id.* at *25 (finding 8 C.F.R. § 1.2, which defines "arriving alien" for purposes of § 1225(b)(1)(A)(i) to include noncitizens "paroled pursuant to [8 U.S.C. § 1182(d)(5)], and even after any such parole is terminated or revoked" to be "*ultra vires* to the extent it subjects parolees to expedited removal"); *see also Lopez Benitez v. Francis*, No. 25 Civ. 5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025) (explaining that treating all "applicants for admission" as individuals "arriving in" the U.S. and "seeking admission" would negate the plainly present-tense construction of the latter phrases, violate statutory interpretation canons such as the rule against surplusage and the "meaningful-variation canon," dramatically narrow the applicability of related, and even recently amended, INA statutes, and "expand § 1225(b) far beyond how it has been enforced historically, potentially subjecting millions more undocumented immigrants to mandatory detention"). Therefore, § 1225 is inapplicable to Munoz Materano and thus ICE violated the INA by invoking it against him.

---

[18] Further, "[t]he statute permits the Attorney General (who has since delegated the authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal."  *Make the Road New York v. Noem*, No. 25 Civ. 190 (JMC), 2025 WL 2494908, at *4 (D.D.C. Aug. 29, 2025) (citing § 1225(b)(1)(A)(iii)(I)).

2. *Due Process*

Even if § 1225 were statutorily applicable to Munoz Materano, the Court finds that Respondents violated his Fifth Amendment Due Process rights by moving to dismiss his Section 240 proceedings, revoking his parole, and arresting him pursuant to § 1225, without providing him notice or an opportunity to be heard. [19]

Respondents argue that, as an "applicant for admission" into the U.S., Munoz Materano has no due process rights beyond "those rights regarding admission that Congress has provided by statute."  Doc. 7 at 10, 11 (quoting *DHS v. Thuraissigiam*, 591 U.S. 103, 140 (2020)); *see also Guerrier v. Garland*, 18 F.4th 304, 313 (9th Cir. 2021) ("In concluding that *Thuraissigiam*'s due process rights were not violated, the Supreme Court emphasized that the due process rights of noncitizens who have not 'effected an entry' into the country are coextensive with the statutory rights Congress provides."). Therefore, Respondents argue, Munoz Materano cannot identify a statutory violation because Respondents did not violate § 1225, and without a statutory violation, he cannot establish a due process violation.  Doc. 7 at 12, 13–17.

As an initial matter, Respondents misstate the law.  The Due Process Clause of the Fifth Amendment "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (citing *Zadvydas*, 533 U.S. at 693); *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").  The Supreme Court has repeatedly—and recently—reiterated this principle.  *See, e.g.*, *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." (citation omitted)); *see also A.A.R.P. v. Trump*, 145 S. Ct. 1364,

---

[19] Munoz Materano also claims that "[t]he government's efforts to simultaneously subject him to expedited removal under 8 U.S.C. § 1225(b)(1) prior to the culmination of the 8 U.S.C. § 1229(a) proceedings violate the Due Process Clause of the Fifth Amendment of the Constitution."  Doc. 1 ¶ 98.  The Court does not make a determination as to this claim since, as previously discussed, Respondents concede that Munoz Materano is currently under § 1229a, not § 1225(b), proceedings.

1367 (2025) ("We have long held that 'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" (citation omitted)).  The Court's decision in *Thuraissigiam* does not suggest that Munoz Materano does not have Due Process rights, as Respondents claim.  There, the petitioner was arrested a mere 25 yards after crossing the border, and the Court held he was still "at the threshold of initial entry."[20]  591 U.S. at 107.  Thus, *Thuraissigiam* serves to reinforce the principle that those present in the U.S., even undocumented individuals, are protected by the Fifth Amendment.  *See Make the Road New York v. Noem*, No. 25 Civ. 190 (JMC), 2025 WL 2494908, at *11 (D.D.C. Aug. 29, 2025) (stating that *Thuraissigiam* "reflects the . . . proposition that noncitizens 'on the threshold of initial entry stand[] on a different footing' than those who have 'passed through our gates'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

Respondents further argue that, even if Munoz Materano could invoke additional due process protections, they would fail because he cannot make the necessary showing that he was "denied a full and fair opportunity to present [his] claims or that the IJ or BIA otherwise deprived [him] of fundamental fairness."  Doc. 7 at 12, 13 (quoting *Burger v. Gonzales*, 498 F.3d 131, 134 (2d Cir. 2007)).  Respondents' argument fails.  "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review."  *Id.*  The Second Circuit applies the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test "when determining the adequacy of process in the context of civil immigration confinement."  *Kelly v. Almodovar*, No. 25 Civ. 6448 (AT), 2025 WL

---

[20] Respondents state that Munoz Materano is an "applicant[] for admission at the threshold of entry into the United States."  Doc. 7 at 9.  However, Munoz Materano, who had already been living and working in the U.S. on parole for nearly two years at the time ICE arrested him, is clearly distinguishable from the petitioner in *Thuraissigiam* who had just barely crossed the border when he was arrested.  *See Make the Road*, 2025 WL 2494908, at *13 ("reject[ing] the Government's extraordinary request to treat as falling outside of the Constitution's due process guarantee the millions of immigrants who, although they may have entered unlawfully, have established lives here and made this country home.").

2381591, at *3 (S.D.N.Y. Aug. 15, 2025) (citation omitted).  That is, "[t]he determination of what procedures are required under the Fifth Amendment requires consideration of: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Lopez Benitez*, 2025 WL 2371588, at *9 (quoting *Chipantiza-Sisalema v. Francis*, No. 25 Civ. 5528 (AT), 2025 WL 1927931, at *2 (S.D.N.Y. July 13, 2025)).  Applying the *Mathews v. Eldrige* test, the Court determines that Munoz Materano's Due Process rights have been violated.

      *a.  Private Interest*

      With regards to the first factor, Munoz Materano invokes "the most significant liberty interest there is—the interest in being free from imprisonment."  *Velasco Lopez*, 978 F.3d at 851.  On May 21, 2025, he was detained without any notice, explanation, or an opportunity to be heard, handcuffed for hours, then transported to multiple detention centers across the country.  Munoz Materano's "liberty interest is clearly established." *Valdez v. Joyce*, No. 25 Civ. 4627 (GBD), 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025) (granting *habeas* petition and finding ICE violated the petitioner's Due Process rights by arresting him as he exited an immigration hearing, after determining—with no support—that the respondent was a flight risk, and then "re-detain[ing] him with no notice, explanation, or opportunity . . . to be heard"); *see also Make the Road*, 2025 WL 2494908, at *10 ("[O]nce they are present in the United States, noncitizens have a 'weighty' liberty interest in remaining, as they 'stand to lose the right to stay and live and work in this land of freedom,' and 'may lose the right to rejoin their immediate family, a right that ranks high among the interests of the individual.'" (alterations adopted) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982))).

### b.  *Risk of Erroneous Deprivation*

As to the second factor, the risk of erroneous deprivation of Munoz Materano's liberty interest is high.  Respondents do not deny that on May 21, Munoz Materano was not provided any notice (or Spanish interpretation)[21] that Respondents were moving to dismiss his Section 240 proceedings and seeking to invoke § 1225, much less given an opportunity to be heard.  Respondents' argument that "[h]aving been placed in removal proceedings to pursue an asylum application and having been considered for release on parole, [Munoz Materano] has been afforded all of the process that he is due," Doc. 7 at 14, is inapposite.[22]  "A person's liberty cannot be abridged without 'adequate procedural protections,'" *Lopez Benitez*, 2025 WL 2371588, at *9 (quoting *Zadvydas*, 533 U.S. at 690), and Munoz Materano "does not contend that greater judicial-type procedures must be imposed upon the administrative actions of ICE than those already required by law[.]" *Id.* (quoting *Chipantiza-Sisalema*, 2025 WL 1927931, at *3).  Even if, *arguendo*, ICE had the "statutory, discretionary authority" to detain Munoz Materano pursuant to § 1225, "the question is whether, in exercising that authority, ICE is required to adhere to the basic principles of due process.  There is no dispute that it is." *Kelly*, 2025 WL 2381591,

---

[21] *See Make the Road*, 2025 WL 2494908, at *14–18 (explaining that § 1225(b) has inherent flaws that exacerbate the risk of erroneous deprivation, such as "the general lack of oversight or any meaningful 'checks' to ensure that individuals 'understand the proceedings, have an interpreter, or enjoy any other safeguards[.]'" (alterations adopted) (citation omitted)).

[22] Respondents argue, in part:  "The constitutional due process rights of applicants for admission are limited to the process that Congress chooses to provide.  In § 1225(b) and related provisions, Congress has afforded applicants for admission a variety of protections, but nevertheless mandated detention with only the possibility of discretionary parole.  Consequently, [Munoz Materano's] detention under § 1225(b) does not violate due process right, and so the Court should therefore deny the *habeas* petition."  Doc. 7 at 17.  Respondents' argument is curious given their prior concession that § 1225(b) does not currently apply to Munoz Materano, while the dismissal of his Section 240 proceedings is under appeal before the BIA.  Respondents cannot simultaneously subject Munoz Materano to § 1225(b), much less maintain that doing so would not violate his Due Process rights.  In any event, as discussed, noncitizens are also entitled to Due Process rights under the Fifth Amendment.  *See Make the Road*, 2025 WL 2494908, at *2 ("[T]he Government makes a truly startling argument:  that those who entered the country illegally are entitled to no process under the Fifth Amendment, but instead must accept whatever grace Congress affords them. Were that right, not only noncitizens, but everyone would be at risk . . . Fortunately, that is not the law."); *see also id.* at *14–18 (discussing how the expedited removal process is fraught with procedural shortcomings which themselves create a high risk of erroneous deprivation, such as by leading to erroneous determinations of whether asylum seekers should be removed from the U.S. or not).

at *4 (holding that ICE violated petitioner's Due Process rights when arresting him pursuant to 8 U.S.C. § 1226(a)[23] at his immigration hearing, seven months after releasing him on his own recognizance, in part because ICE's "mere 'review'" of his May 2025 criminal convictions prior to arresting him did not amount to "an individualized assessment of a suspect's flight risk or dangerousness"); *see also Torres-Jurado*, 2023 WL 7130898, at *4 ("[B]efore the Government unilaterally takes away that which is sacred, it must provide *meaningful* process." (emphasis in original) (citation omitted)). Here, it is clear that Munoz Materano did not receive process regarding the revocation of his parole.

Respondents do not contest that Munoz Materano's humanitarian parole, granted on August 28, 2023, was valid until August 28, 2025, and they do not provide any indication that any individualized determination was made for its revocation—it is not even clear from the record exactly when, or how, a revocation was effected.[24]  "Section 1182 provides that parole may be granted 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'"  *Mata Velasquez*, 2025 WL 1953796, at *10 (quoting 8 U.S.C. § 1182(d)(5)(A)).  "To revoke parole, in turn, a DHS

---

[23] 8 U.S.C. § 1226(a) concerns the discretionary "arrest, detention, and release" of noncitizens.  It provides: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States . . . [P]ending such decision, the Attorney General--  (1) may continue to detain the arrested alien; and (2) may release the alien on-- . . . (B) conditional parole . . ."  8 U.S.C. § 1226(a)(1), (2)(B).

[24] In fact, Munoz Materano argues that Respondents are detaining noncitizens without individualized determinations as a matter of course.  He argues that in recent months, Respondents have engaged in an aggressive nationwide campaign to seek dismissal of noncitizens' Section 240 removal proceedings without providing them prior notice, arresting them and placing them in expedited removal proceedings, and "denying them any meaningful opportunity to be heard before quickly removing them from the country." Doc. 1 ¶¶ 55–57.  Effective January 21, 2025, DHS made a "designation" regarding the population of noncitizens who can be subject to expedited removal pursuant to § 1225(b)(1)(A)(iii)(I).  *See supra* n.18. Specifically, the 2025 designation "authorized DHS 'to exercise the full scope of its statutory authority' in utilizing expedited removal."  *Make the Road*, 2025 WL 2494908, at *5 (quoting Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025) (the "2025 Designation")); *see also id.* at *5 n.7.  Pursuant to the 2025 Designation, "DHS asserts the authority to apply expedited removal to noncitizens 'who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years.'"  *Id.* (quoting the 2025 Designation).

official with authority must decide either that the 'the purpose for which parole was authorized' has been 'accomplished' or that 'neither humanitarian reasons nor public benefit warrants the continued presence of the noncitizen' in the United States.'"  *Id.* (alteration adopted) (quoting 8 C.F.R. § 212.5(e)(2)(i)); *see also Y-Z-L-H*, No. 25 Civ. 965 (MHS), 2025 WL 1898025, at *7 (D. Or. July 9, 2025) ("Common sense suggests . . . that parole given only on a case-by-case basis is to be terminated only on such a basis." (citation omitted)); *Orellana*, 2025 WL 2402780, at *6 (holding that respondents violated the APA by failing to make a "case-by-case" determination as to the revocation of the petitioner's parole, and also failed to demonstrate that petitioner received adequate notice of his parole revocation).

Here, Respondents provide no indication that an individualized determination was made as to the revocation of Munoz Materano's parole; nor do they articulate, even now, either that the purpose for which Munoz Materano's parole was authorized has been accomplished, nor that neither humanitarian reasons nor public benefit warrants his continued presence in the United States.  *Mata Velasquez*, 2025 WL 1953796, at *17 (finding a risk of erroneous deprivation, where, "[d]espite the government's previous finding to the contrary, it has not provided 'a reasoned explanation or any changed circumstances,' that would support a decision that 'neither humanitarian reasons nor public benefit warrants [his] continued presence . . . in the United States[.]'" (quoting *Y-Z-L-H*, 2025 WL 1898025, at *13 and 8 C.F.R. § 212.5(e)(2)(i))); *see also Lopez Benitez*, 2025 WL 2371588, at *12 (alterations adopted) (citation omitted) ("[W]hen DHS first released [petitioner] in 2023 pursuant to § 1226(a), it could not have done so validly unless it did not consider him to be a flight risk or danger to the community at that time, and Respondents do not contend that his 2023 release was erroneous . . . Moreover, Respondents have failed to articulate any change in circumstances between the time of [the petitioner's] initial release in 2023 and his re-detention in 2025 that now makes him a flight risk or a danger to the community." (alterations adopted) (internal quotation

marks and citations omitted)).  To the contrary, Respondents do not contest that Munoz
Materano's application for asylum, withholding of removal, and CAT was pending, and
that meanwhile, he was living as a law-abiding member of his community, working
lawfully, and in compliance with the requirements of his immigration proceedings.

In their opposition, Respondents appear to side-step the issue of the revocation of
Munoz Materano's parole from 2023; they argue only that they properly invoked the
expedited removal process, on the heels of the IJ's dismissal of Munoz Materano's
Section 240 proceedings, and that § 1225(b) mandates detention with "only the
possibility of discretionary parole."  Doc. 7 at 17.  However, "nothing in the record
reflects . . . (1) who made the decision to detain [Munoz Materano], (2) when that
decision occurred, (3) on what basis the decision to detain him was made, (4) whether
there was any material change in circumstances with respect to [Munoz Materano] that
triggered his detention, or (5) whether there was any sort of new policy in place that
triggered his detention."  *Lopez Benitez*, 2025 WL 2371588, at *11 (granting the *habeas*
petition of a noncitizen who was re-detained more than two years after being released on
his own recognizance from ICE custody, pursuant to § 1226(a), and remarking, "the utter
lack of transparency here is problematic, to say the least, as it makes it impossible to
determine why [petitioner] was detained in the first place"); *see also Chipantiza-
Sisalema*, 2025 WL 1927931, at *3 (finding a Due Process violation where ICE took
petitioner into custody under § 1226(a) without explaining why it detained her or
contending that it made an individualized assessment that she should be detained, and
stating:  "ICE summarily detained [the petitioner] pursuant to an agency policy of
arbitrary detention without affording her notice or opportunity to be heard"); *Mata
Velasquez*, 2025 WL 1953796, at *17 ("To mitigate the risk of erroneous deprivation, due
process requires, 'at a minimum, the opportunity for [petitioner] to submit evidence
relevant to whether the government should revoke his parole before it makes a revocation
decision." (alterations adopted) (citing *See Torres-Jurado*, 2023 WL 7130898, at *4)).

In sum, Munoz Materano's re-detention without any individualized assessment such as "any change in circumstances" since the government released him on parole "establishes a high risk of erroneous deprivation of his protected liberty interest." *Lopez Benitez*, 2025 WL 2371588, at *12 (quoting *Valdez*, 2025 WL 1707737, at *4); *see also Mata Velasquez*, 2025 WL 1953796, at *17 ("DHS has announced that it intends to revoke parole for everyone like [petitioner] without any regard for individual circumstances . . . To mitigate the risk of erroneous deprivation, due process requires, 'at a minimum, the opportunity for [petitioner] to submit evidence relevant to whether the government should revoke his parole before it makes a revocation decision.'" (alterations adopted) (citing, *inter alia*, Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13612 (Mar. 25, 2025) ("Termination Notice")[25])).

### c. *Government Interest*

Finally, Respondents have "failed to show a significant interest" in Munoz Materano's detention. *Valdez*, 2025 WL 1707737, at *4. Respondents do not argue that Munoz Materano is dangerous or a flight risk, nor could they—it is not disputed that Munoz Materano has lived lawfully in this country since his parole, has worked, and

---

[25] In the Termination Notice, issued on March 25, 2025, DHS terminated the "CHNV Parole Programs," which it had established in 2022 and 2023 for nationals from Cuba, Haiti, Nicaragua, and Venezuela to obtain parole, by, in part, "create[ing] a process under which noncitizens, along with a U.S.-based supporter, could apply in advance to travel to a U.S. port of entry." *See Coalition for Human Immigrant Rights*, 2025 WL 2192986, at *8 (quoting Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022)). In the Termination Notice, DHS stated: "The temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025 will terminate on that date unless the Secretary makes an individual determination to the contrary. Parolees without a lawful basis to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date." *Id.* (quoting the Termination Notice, at 13611). On April 14, 2025, a District of Massachusetts court stayed the termination notice "insofar as it revokes, without case-by-case review, the previously granted parole and work authorization issued to noncitizens paroled into the United States pursuant to parole programs for noncitizens from Cuba, Haiti, Nicaragua, and Venezuela . . . prior to the noncitizen's originally stated parole end date." *Id.* (quoting *Doe v. Noem*, No. 25 Civ. 10495 (IT), 778 F. Supp. 3d 311, 319 (D. Mass. Apr. 14, 2025)). On May 30, 2025, however, the Supreme Court stayed the District of Massachusetts' order, pending disposition of the government's appeal to the First Circuit and any writ of certiorari. *Noem v. Doe*, 145 S. Ct. 1524 (2025).

voluntarily presented himself at his immigration hearing.  *See Velasco Lopez*, 978 F.3d at 854 ("[T]he Government has not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight."); *cf. Mata Velasquez*, 2025 WL 1953796, at *17 (the government "has an interest in detaining noncitizens 'to ensure that they will be available if they are determined to be deportable.'" (alterations adopted) (citation omitted)).  Moreover, courts have recognized that "*minimizing* the enormous impact of incarceration in cases where it serves no purpose" furthers the government's interest, which pursuant to *Mathews v. Eldridge*, includes "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Velasco Lopez*, 978 F.3d at 854 (emphasis added) (citation omitted); *see also Mons v. McAleenan*, No. 19 Civ. 1593 (JEB), 2019 WL 4225322, at *2 (D.D.C. Sept. 5, 2019) (explaining that, according to a 2009 DHS "Parole Directive," "if an asylum-seeker establishes her identity and that she presents neither a flight risk nor a danger to the public, her detention 'is *not* in the public interest,' and thus ICE '*should*, absent additional factors . . . parole the alien.'" (emphasis in original) (citing ICE Directive 11002.1, Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009)).  While the government has an interest in enforcing immigration laws at the border, it must pursue that interest "in a manner consistent with the Constitution."  *Make the Road*, 2025 WL 2494908, at *19 (quoting *A.A.R.P.*, 145 S. Ct. at 1368); *id.* (noting that the government "has not explained why it is unable to efficiently enforce the immigration laws, including the expedited removal statute, while also affording individuals with their 'core' due process right:  'notice and a meaningful opportunity to be heard.'").

In sum, applying the *Mathews v. Eldridge* balancing test, the Court finds that Munoz Materano's sudden and continuing detention, "with no process at all, much less prior notice, no showing of changed circumstances, or an opportunity to respond, violates his due process rights."  *Valdez*, 2025 WL 1707737, at *4; *see also Lopez v. Sessions*, No. 18 Civ. 4189 (RWS), 2018 WL 2932726, at *12 (S.D.N.Y. June 12, 2018) ("Petitioner's

re-detention, without prior notice, a showing of changed circumstances, or a meaningful opportunity to respond, does not satisfy the procedural requirements of the Fifth Amendment.")). "In light of the deprivation of [Munoz Materano's] liberty, formerly granted and approved by Respondents" through their grant of humanitarian parole, "the absence of any deliberative process prior to, or contemporaneous with, the deprivation, and the statutory and the constitutional rights implicated, a writ of *habeas corpus* is the only vehicle for relief. It is, in essence, the most appropriate remedy." *Id.* at *15.[26]

   *3. APA*

   Munoz Materano also argues that Respondents violated the APA by revoking his parole, moving to dismiss his case, and invoking § 1225. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). In opposition, Respondents argue that their motion to dismiss was properly brought before the IJ; however, they do not provide any argument regarding Munoz Materano's claim that they violated the APA by revoking his parole. Doc. 7 at 7–8.[27] The Court finds that, in arresting Munoz Materano, Respondents revoked his parole in violation of the APA.

---

[26] Because of the Court's decision on the Due Process claim, the Court does not reach Munoz Materano's claims that "to the extent that Respondents have violated their own regulations for the revocation of humanitarian parole, their actions have violated the *Accardi* doctrine." Doc. 1 ¶ 117.

[27] Respondents only argue, generally, that Munoz Materano cannot assert an APA claim to challenge the validity of his detention because "[t]he Supreme Court recently held that, for an action bringing claims under statutes including the APA and the INA that necessarily imply the invalidity of a detainee's confinement, regardless of whether a detainee formally requests release from confinement, such 'claims fall within the "core" of the writ of *habeas corpus* and *must be brought in habeas*.'" Doc. 7 at 17–18 (emphasis in original) (quoting *J.G.G.*, 143 S. Ct. at 1005). However, the Supreme Court did not specifically state that, if a petitioner challenges his detention through a *habeas* petition, the petitioner cannot also assert an APA claim. In any event, here, this Court considers Munoz Materano's claim that the revocation of his parole, not his detention itself, violated the APA—something which at least one other court within this Circuit has done following the Supreme Court's decision in *J.G.G. See generally Orellana*, 2025 WL 2402780. In *Orellana*, like in the instant case, the petitioner had been granted humanitarian parole pursuant to § 1182 upon entering the U.S. *Id.* at *1. Six months later, the petitioner was arrested by ICE as he exited

As discussed, "[a]fter parole has been granted, the Secretary may only revoke parole 'when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served.'" *Orellana*, 2025 WL 2402780, at *5 (quoting 8 U.S.C. § 1182(d)(5)(A)). "Several courts have found that, as in the case of grants of parole, Section 1182 requires an individualized case-by-case determination before parole can lawfully be revoked." *Id.* (internal citations omitted) (collecting cases).

Respondents fail to show on what grounds they might have revoked Munoz Materano's humanitarian parole.[28] As previously discussed, "[t]o revoke parole, in turn, a DHS official with authority must decide either that the 'the purpose for which parole was authorized' has been 'accomplish[ed]' or that 'neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen]' in the United States.'" *Mata Velasquez*, 2025 WL 1953796, at *10 (quoting 8 C.F.R. § 212.5(e)(2)(i)); *See also Y-Z-L-H*, 2025 WL 1898025, at *7. Here, however, "Respondents do not argue that the purpose of parole was satisfied and they do not contend that they engaged in an individualized analysis to determine whether the purpose of [Munoz Materano's] parole had been accomplished." *Orellana*, 2025 WL 2402780, at *5; *see also Mata Velasquez*, 2025 WL 1953796, at *11 ("[T]he words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole 'must attend to the reasons an individual [noncitizen] received parole.'" (citation omitted)). Nor do

___

an immigration hearing; he filed a *habeas* petition in which he also claimed that his humanitarian parole was wrongfully revoked in violation of the APA. *Id.* at *1. The court found an APA violation because the petitioner was denied the required procedure for revocation of parole. *Id.* at *6.

[28] It is unclear from the record whether Respondents even provided Munoz Materano with "notice, let alone *adequate* notice" of the revocation of his parole. *Orellana*, 2025 WL 2402780, at *6 (emphasis in original) (finding an *Accardi* violation and APA violation based on DHS' failure to comply with the procedures in 8 C.F.R. § 235.3(b)(6), which provides that a noncitizen shall be "given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States . . . [and] be allowed to present evidence or provide sufficient information to support the claim."). Respondents have not provided a notice of revocation of parole on the record, and the only indication that Munoz Materano might have ever received one is Ms. Eugenio's statement that, on August 11—over two months after Munoz Materano was detained—she learned during a telephone call with him that he received a parole revocation notice. Doc. 16-1 ¶ 15.

Respondents present any evidence that humanitarian reasons no longer warrant his continued presence in the United States. *Id.* Rather, as discussed, they do not deny that Munoz Materano is an applicant for asylum who has lived and worked as a law-abiding member of his community, in accordance with his parole and work authorization, and that he has shown compliance with the requirements of his immigration proceedings—including by appearing at his hearing on May 21. Therefore, Respondents have not shown compliance with 8 U.S.C. § 1182. "Thus, Respondents acted arbitrarily and capriciously, in violation of the APA, when they denied [Munoz Materano] the required procedure before revoking his parole." *Orellana*, 2025 WL 2402780, at *6 (finding an APA violation and stating: "Respondents represented to the Court that, because petitioner no longer had parole status, ICE lawfully detained him pursuant to 8 U.S.C. § 1225(b)(2).").

     *4. Fourth Amendment*

     Munoz Materano argues that his arrest violated the Fourth Amendment, because the "government lacked reliable information of changed or exigent circumstances that would justify his arrest after federal immigration authorities had already decided [he] could pursue his claims for immigration relief at liberty" when they granted him parole. Doc. 1 ¶ 112. Respondents do not provide any arguments in opposition to Munoz Materano's Fourth Amendment claim, and therefore, the Court deems this claim uncontested. Because, as previously discussed, Respondents have not asserted any new circumstances about Munoz Materano, nor any particular circumstances from May 21, 2025 that would have reasonably triggered his arrest, the Court finds Respondents violated his Fourth Amendment rights. *See Zuniga-Perez v. Sessions*, 897 F.3d 114, 122 (2d Cir. 2018) (explaining that the Fourth Amendment applies to undocumented individuals).

### C.  Munoz Materano's Confinement

Finally, Munoz Materano argues that he has been denied medical care in violation of his Due Process rights.  The Fifth Amendment of the Constitution guarantees that civil detainees, including noncitizen detainees, may not be subject to conditions of confinement or denial of medical care that "amount to punishment."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019) ("In *Estelle v. Gamble*, . . . the Supreme Court held that the state has a constitutional obligation to provide medical care to persons it is punishing by incarceration.") (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment[.]"  *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted); *see also Charles*, 925 F.3d at 85 (explaining that this principle extends to civil detainees (citing *Youngberg v. Romeo*, 457 U.S. 307, 321–228 (1982)).  Munoz Materano must make two showings:  (1) the existence of a "serious medical need," and (2) that Respondents acted with deliberate indifference to such need. *Charles*, 925 F.3d at 85.

Under the first, objective prong, the Second Circuit has held that a medical condition is "sufficiently serious" if it presents a "condition of urgency such as one that may produce death, degeneration, or extreme pain."  *Id.* 925 F.3d at 86 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).  In assessing whether the condition is sufficiently serious, courts consider facts such as "whether a reasonable doctor or patient would find the injury important and worthy of treatment," whether the condition "significantly affects an individual's daily activities," and whether it "inflicts chronic and substantial pain."  *Id.* (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The Second Circuit has stated that the second, deliberate indifference prong, "can be established by either a subjective or objective standard: A [petitioner] can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to [the plaintiff's] health or safety.'" *Charles*, 925 F.2d at 87 (emphasis in original) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2017)). While "mere negligence" does not suffice, "medical malpractice . . . may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Charles*, 925 F.2d at 87 (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000)).

The Court determines, first, that Munoz Materano has a sufficiently serious medical condition. Munoz Materano has a fungal infection that began ████████ and appears to have spread to his face, a swollen, tender ████ with an unidentified mass, and various symptoms including a burning sensation when he urinates, persistent pain █ ████████, as well as numbness in his legs. These symptoms began during Munoz Materano's detention, and they have made it increasingly difficult for him to urinate, sleep, and walk—even leading him to resort to a wheelchair for transportation on July 28. Munoz Materano's health condition has thus significantly affected his daily activities, and it is one which "a reasonable doctor or patient would find . . . important and worthy of treatment." *Charles*, 925 F.3d at 86. In fact, multiple medical providers who have examined him while in detention have ordered further tests; for example, on June 19, one doctor who observed that Munoz Materano's "████ [were] enlarged," and that his ████ ████ had a "████ mass" referred him to radiology for a ████ ultrasound. Doc. 9-2 at ECF 44, 108. And on June 28, a different medical provider recommended an ultrasound, as well as an "████ lab" and testing for hepatitis, ████████ ████████████████. Doc. 9-1 at 101.

The record also shows that Munoz Materano's condition has degenerated. While Munoz Materano's earlier medical records reflect mere itchiness and discomfort while urinating, subsequent records indicate—among other symptoms—the proliferation of white spots and red patches, a burning sensation while urinating, and aching pain rated at a 7/10 or 8/10. Munoz Materano also states in his July 19 declaration that his pain, which "feels like throbbing, almost like [he has] been beaten or kicked in that area," is so intense that it causes him to feel briefly disoriented. Doc. 1-2 ¶ 28. Should Munoz Materano's condition continue to degenerate, it could lead to severe consequences. In Dr. Sugarman's July 23 declaration in support of Munoz Materano's petition, she explains that, if ███████ torsion goes untreated, it can lead to permanent loss of ████, and if ██████ cancer is not diagnosed early, it could require intensive treatment such as chemotherapy or radiation and could lead to infertility, metastatic cancer, or even death. Doc. 1-3 ¶¶ 6, 8, 9. While Dr. Sugarman does not make any specific diagnosis or prognosis, she expresses her concern—based on Munoz Materano's symptoms—that he has not been "referred to a urologist or oncologist, nor received diagnostic imaging or a biopsy." *Id.* ¶ 7. Dr. Sugarman cautions: "Current medical records do not indicate appropriate referrals, imaging, testing or follow-up care. Without timely evaluation, it could lead to infertility, permanent injury, or death if cancer is present." *Id.* ¶ 10.

Therefore, based on the record, the Court finds that, because Munoz Materano's medical condition could "degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000) (citation omitted) (holding that a detainee's tooth cavity constituted a serious medical condition because, while "[o]rdinarily, a tooth cavity is not a serious medical condition," it is "a degenerative condition that tends to cause acute infections, debilitating pain and tooth loss if left untreated.").

Second, the Court finds that Respondents acted with deliberate indifference towards Munoz Materano's serious medical needs, by inconsistently administering his medications despite his evident deterioration—all while transferring him at least ten times, to eight different detention centers in four different states, under un-hygienic conditions.  On July 8, 2025, a medical provider observed that Munoz Materano's epididymitis had likely persisted because he "never completed a full course" of Doxycycline.  Doc. 9-1 at ECF 101.  Then, between July 14 and 26, Munoz Materano's Clotrimazole 1% was administered only seven total times instead of 26 times over 13 days.  Doc. 9-1 at ECF 8–9.  From July 14 to 18, his Doxycycline was administered seven total times instead of 10 times over five days.  *Id.* at 10.  And from July 14 to 22, Munoz Materano's Ibuprofen was administered 11 total times instead of 18 times over nine days.  *Id.* at 11–12.  Therefore, although Respondents argue that Munoz Materano "has been seen no fewer than 23 times since he was detained," the number of medical visits does not demonstrate that "ICE has provided [Munoz Materano] with adequate care," as Respondents claim.  Doc. 7 at 21.  Rather, the medical records reveal that Respondents did not adhere to the medication plans on the recommended schedules, all while Munoz Materano complained of persistent and worsening symptoms.  *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) (finding deliberate indifference, and stating that the fact that the defendant "frequently examined" the plaintiff detainee did not vindicate him, because "[t]he course of treatment [plaintiff] received clearly did not alleviate his suffering" and so "a jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [his] situation.").

Respondents also argue that the medical provider who observed a mass on Munoz Materano's ███ is an "outlier"—because providers who examined Munoz Materano before and after that provider did not find ███ masses—and therefore Respondents'

37

failure to conduct the imaging that he recommended does not give rise to a constitutional claim.  Doc. 7 at 21–22.  However, as previously discussed, Munoz Materano has various serious symptoms aside from the ███████ mass, particularly when considered in the context of his generally deteriorating condition.  In fact, even the medical provider that, on July 8, stated she found no "palpable masses" when examining Munoz Materano at Coastal Bend, recommended an ultrasound to further evaluate his nodule, as well as various labs based on his ██████ lesions.  Doc. 9-1 at ECF 101.  Nonetheless, as Dr. Sugarman attested, Munoz Materano's records "do not indicate that he was referred to a urologist or oncologist, nor received diagnostic imaging or a biopsy."  Doc. 1-3 ¶ 7.

In sum, Respondents failed to provide recommended testing, and failed to ensure that Munoz Materano has the continuity of access to medications that he needs; this, it is clear, is likely as a result of the frequent, haphazard transfers to which he was subjected. These omissions, in the face of Respondents' awareness of Munoz Materano's worsening condition, indicate Respondents' deliberate indifference to his serious medical needs.[29]

## III.  CONCLUSION

For the reasons set forth above, Munoz Materano's petition is GRANTED. Respondents are ORDERED to immediately release Munoz Materano from custody.

Further, the Court finds that Respondents detained Munoz Materano in violation of his Fifth Amendment Due Process Rights, the Fourth Amendment, the INA, and the

---

[29] Because the Court finds that Munoz Materano has been denied medical care in violation of his Due Process rights, it does not reach his claim that ICE has violated the APA and the *Accardi* doctrine by failing to comply with its own rules and standards for immigration detention.  Doc. 1 ¶ 85.  The *Accardi* doctrine, first announced in *United States ex rel. Accardi Shaughnessy*, 347 U.S. 260 (1954), mandates federal agencies to adhere to their own procedures and regulations, especially when these regulations affect the rights and interests of individuals.  *See Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991); *see also Accardi*, 347 U.S. 260.  However, the Court notes that facially, there appears to at least be an *Accardi* violation because Respondents have failed to provide Munoz Materano with the access to prescribed medications, timely medical attention, and clean clothing that he is owed pursuant to ICE's detention policies.  *See Accardi*, 347 U.S. at 265 ("The crucial question is whether the alleged conduct of the [agency] deprived [the] petitioner of any of the rights guaranteed him by the statute or by the regulations issued pursuant thereto.").

APA, and that the conditions of Munoz Materano's confinement violate the Fifth Amendment.

Munoz Materano's counsel is instructed to submit its fee application and corresponding billing records to the Court by September 23, 2025. Respondents are instructed to file any opposition by October 7, 2025.

It is SO ORDERED.

Dated:     September 9, 2025
           New York, New York

_____
     EDGARDO RAMOS, U.S.D.J.